[*General Term, April,* 1872.]

FARMERS' INSURANCE CO. *v.* GEO. LA RUE, AUDITOR.

Since the passage of the statute of May 7, 1869, 66 O. L. 325, secs. 14 and 6, *unpaid notes*, given to joint stock insurance companies incorporated under the act of April 11, 1856, 1 S. & C. 361, for unpaid subscription to capital stock, are taxable to such companies as "credits," at their true value in money.

Section 14 of that act is not retroactive within the prohibition of article 2, section 28, of the constitution.

*Matthews, Ramsey & Matthews,* for plaintiff.

*Scarborough & Williams,* and *Stallo & Kittredge,* for defendant.

YAPLE, J.   This suit is prosecuted by the Farmers' Insurance Company, a joint stock insurance company, incorporated under the laws of this State, against George S. La Rue, as the auditor of Hamilton county, to perpetually enjoin the levy, etc., of a tax upon eighty thousand dollars of its notes, which were given to, and received by, it for the unpaid subscription to its capital stock, between November 19, 1866, and December 14, 1866.   The insurance company was incorporated with an authorized capital of $100,000, of which $20,000 was paid in by the subscribers, and the above-mentioned notes taken for the residue of the subscriptions to the capital stock.

A temporary injunction has been allowed, and is still in force.

The insurance company asks for the injunction.   It is in the full exercise of its corporate functions, and does not claim that it intends to wind up its affairs without calling upon its stock subscribers to pay these notes given therefor. It claims that they are not taxable to it, though it may con-

tinue as a corporation, doing an insurance business, for an indefinite period.

On the trial, in Special Term, the court found the facts and reserved the case for decision here. The finding is as follows:

" That the notes referred to in the petition were given by subscribers to the capital stock of the plaintiff for balances of unpaid subscriptions thereto, and said notes were dated November 19, 1866, to December 14, 1866; and that the stock was issued to said stockholders, and said notes taken, in all respects conformably to the act of April 11, 1856."

The notes are in this form:

" $——                          CINCINNATI, ——, 18—.

:" On demand, — promise to pay to the Farmers' Insurance Company the sum of —— dollars, for value received, the same being a balance due on —— shares of the capital stock held by —— in said company, subject to the call of the board of directors, in whole, or in such installments as may be required to meet their liabilities."

The shares of stock are required by law to be twenty dollars each.

Section 4 of the act of April 11, 1856, 1 S. & C. 361, relating to the incorporation of joint stock insurance companies, provides, that " at the time of subscribing for stock in any company organized under this act, the person so subscribing shall pay the sum of four dollars in money, on each share subscribed, and the balance on each share shall be subject to the call of the directors, secured to their approval by indorsed notes, payable on demand, or by other property or stocks," etc.

Section 10 of the same act provides that, "It shall be lawful for such company to loan or invest any part of its capital stock, money, or other funds, in such way as the directors shall deem best for the safety and interest of the stockholders, and to sell, transfer, and dispose of any in-

terest which the company may have acquired by any such loan or investment."

In 1869, 66 O. L. 325, prior to the action of the auditor complained of, another act was passed in relation to joint stock insurance companies, section fourteen of which is as follows:

"SEC. 39. Any company *heretofore* organized under any law of this State for any of the purposes mentioned in this act, which *has taken* notes or obligations of its stockholders for any portion or portions of the amount subscribed by them to its capital stock, shall, . . . within five years from the first day of July, A. D. 1869, increase its capital stock to at least one hundred thousand dollars, paid up and invested in the manner required by section 6 of this act," etc. It also requires fifty per cent. of all dividends to be retained and applied to unpaid stock notes until such notes shall be fully paid. Such investments are required to be in stocks of the United States or State of Ohio, producing six per cent. per annum; or in bonds and mortgages on improved unincumbered real estate in the State of Ohio, worth fifty per cent. more than the amount loaned thereon.

Our laws of taxation applicable to the case are substantially as follows: Constitution, article 12, section 2, "Laws shall be passed, taxing by a uniform rule, all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise," etc.

The term "credits" was incorporated into the constitution with the meaning which prior laws of the State had given it.

"The term 'credits' . . . shall be held to mean and include every claim or demand for money, labor, or other valuable thing due or *to become due*," etc. Tax law of 1846, 44 O. L. 85; and see 2 S. & C. 1439, 1440, sec. 2.

Section 16 of the tax law of 1859, 2 S. & C. 1446, provides that, "The president, secretary, or principal accounting officer of . . . or other" [every] "joint stock

company, . . . for whatever purpose they" [it] " may have been created . . . shall list for taxation, . . . all the . . . moneys and credits of such company or corporation, within the State, at the actual value in money," etc. Also, S. &. S. 756.

Section 2 of the act just referred to, permits individuals to deduct certain classes of their debts from their credits, and to return only the excess of the credits for taxation; but that section enacts, that, " But in making up the sum of such debts owing, there shall be taken into account no obligation to any mutual insurance company, nor any unpaid subscription to the capital stock of any joint stock company, . . . nor any acknowledgment of any indebtedness unless founded on some consideration *actually received* and believed at the time of making such acknowledgment to be a full consideration therefor," etc.

And section 10 of the same act, 2 S. & C. 1444, provides: " No person, company, or corporation shall be entitled to any deduction, on account of any bond, note, or obligation of any kind, given to any mutual insurance company; . . . nor on account of any unpaid subscription to, or installment payable on, the capital stock of any company, whether incorporated or unincorporated."

And section 6 of the same act, p. 1442, S. &. S. 758, requires every person to list for taxation all his " investments in stocks and joint stock companies."

The constitution also gives the legislature power to alter or repeal laws under which corporations may be formed. Art. 13, sec. 2. So no part of the charter of a corporation formed under our State constitution can amount to a contract, except it be a contract, one of the terms of which is, that it may be altered at the pleasure of the State. The constitution of the United States forbids the passage of any law, by a State, impairing the obligation of contracts. Art. 1, sec. 10.

And article 2, section 28, of our State constitution pro-provides, that " the general assembly shall have no power

to pass retroactive laws." But by the decision of the Supreme Court, in *Rairden, etc.* v. *Holden,* 15 Ohio St. 210, no statute is retroactive or retrospective, within this clause of the constitution, which does not take away or impair vested rights acquired under existing laws, or create a new obligation, impose a new duty, or attach a new disability, in respect to transactions or considerations already past.

It is claimed by the auditor, acting in pursuance of instructions from the auditor of state, that these notes, given for subscriptions made to the capital stock of this joint stock insurance company are " credits," within the meaning of the constitution and tax laws, and therefore taxable. The company insists that they are not " credits," but mere unpaid subscriptions for stock, that may or may not be required to be paid; that the company has the option to require or not require their payment, and, until it actually requires payment, they are mere *possible* " credits," not absolute " credits;" that they are no more credits of the company than the liability of the stockholders to its creditors, in case of its insolvency, to an amount equal to their stock, which, as it can not be presumed that the company will become insolvent, is a mere contingent or possible liability on their part; and, as a credit, a mere contingency or possibility belonging to the creditors of the company only.

In reply to this, the auditor maintains that the act of incorporation requires the capital stock of all such companies to be at least $100,000—one fifth, or $20,000, to be paid at the time of subscribing the stock; and, hence, that if the four-fifths may lawfully never be required to be paid, it will be equivalent to requiring such corporations to have no more than $20,000 capital, and thus render the statute fixing the *minimum* amount of capital nugatory. In behalf of the company it is also insisted, that in this joint stock company, as in all similar companies, the stockholder's note really represents a contingent debt due to himself; and that until losses occur, over and above the capital paid in, which must be paid out of the notes, no debt arises; and this posi-

tion is doubtless correct in the case of a mutual company or a mere partnership.

To this it is replied, that the company is a corporation, a person by legal creation, distinct in law from all the persons composing such corporation—that is, owning its stock; and which is entitled to retain and control all its capital and effects, as against every stockholder. They can only get into their individual possession their respective interest in the corporation upon its winding up and ceasing to exist as a corporation.

Now, we think it beyond dispute that such companies are corporate *persons*, and legally *distinct* from all the stockholders who own and control them. "We are not to assume that this corporation was created for the mere benefit of the stockholders. The general assembly must be supposed to have had a view to the public good, when they authorized the company to make contracts of indemnity against the calamities of fire." *Straus* v. *Eagle Insurance Co.*, 5 Ohio St. 65.

In this respect we see no difference between this and any other corporation. It differs from a mutual company or a partnership. When any corporation ceases to exist, its effects go to the stockholders in proportion to their respective interests. Whether many or few persons own the stock of a corporation does not affect its essential character.

It is said in argument, by the complainant's counsel, that the practice of the State authorities, from 1856, when the act was passed, up to about the time of the bringing of this suit, July 5, 1870, was to treat such notes, not as credits, but as mere possibilities; and it is argued, from thence, that the presumption now to treat them as absolute credits is erroneous.

If the question stood alone upon the act of April 11, 1856, the question would be very difficult to decide, and the uniform practice of the State under the statute might be entitled to great weight in considering its proper construction. But as we have seen in 1869, 66 Ohio Laws, 325,

an act was passed, requiring all such companies *heretofore* organized to retain fifty per cent. of all dividends to be applied to such notes until they should be fully paid, and to collect and invest the proceeds of such notes, as required by section 6 of the act, within five years from July 1, 1869, under penalty of forfeiture of charter. The note itself gives the company the right and option to collect it at any time. This statute fixes the limits of, and directs and controls that discretion previously vested by law, and by the contract of the maker of the note, in such corporation. It is true the *quantum* of a corporation's contract rights with individuals can not be increased by subsequent legislation; but if a debtor to the corporation be already liable to pay whenever, and as called upon by the corporation, the legislature can, by law, direct when and how the corporation shall exercise the discretion and power given it under such *contract*.

As section 4 of the act of 1856 requires the *minimum* capital of such companies to be $100,000—$20,000 to be paid at once—and as the subscribers for the stock give to the corporation, by their notes for the unpaid balance, the absolute right to collect all of the amount, it seems to be a clear and proper exercise of power, on the part of the legislature, when it is discovered that the corporation has failed to exercise its discretion properly, considering the duty it owes to the public, and the dangers likely to ensue from such financial weakness, and virtually fixes its *minimum* capital at $20,000, instead $100,000, acting on "*mutual*" rather than joint stock principles, to interpose and compel the collection of such notes, and the proper investment of their proceeds. But it is still claimed that no part of such note becomes an actual debt until a call has, in fact, been made by the company for the payment of all or part of it. That would, it is true, fix definitely when such debt would become due, and would aid in ascertaining its value. But this law fixes with certainty that all such notes must be paid in five years from July 1, 1869, in any event making them debts certain. There is no escape but for the

company to wind up its business and cease to be a corporation, in which event it would need no part of the money. If this be contemplated, the company must aver the fact. This plaintiff makes no such claim.

Under this act of 1869, then, we think such notes are absolute debts, payable to the corporation by the makers and indorsers, and are absolute "credits" belonging to it, and taxable as such at their true value in money, which may be very different from the amounts named in them.

If sued on one of these notes by the corporation, the maker could not defend on the ground that, but for the act of 1869, he would never have been called on by the company to pay any part of it; for he absolutely promised to pay all or any part of it whenever called upon, and the company calls, because required by law to do so, in its exercise of a proper supervisory power over such corporations. One of its liabilities is to obtain a certain amount of certain stocks or real estate mortgages with the proceeds of such notes.

The New Jersey case, cited by counsel for complainant, *The State, etc.* v. *Tunis, etc.*, 3 Zab. 546, does not seem applicable to this case. There "credits" were not taxable at all.

In Ohio, "credits" must be taxed. The same remark that applies to the New Jersey case will apply to the tax cases, 12 Gill & Johns. 117.

In the case of *Ryland* v. *Delisle*, 3 Priv. Counc. App. 17, it appears that the act of 14 and 15 Vict. c. 51, allowed any creditor of a corporation, after the return of execution unsatisfied, to sue and recover from any stockholder who had not paid up for his stock the amount unpaid. Such a subscriber, the president of the company, was sued by such a creditor. The act also deemed debts *equally liquidated* as mutually canceling each other. To this suit the president pleaded that the company owed him more on his salary than he owed it upon his stock subscription, and claimed a set-off. The privy council held that the claims were **not**

" equally liquidated;" that the payment on stock could not fall due till thirty days after call for its payment—not that it was not any debt at all; and also that if the president had a judgment against the company for his salary, he could not set it off in a suit brought against him to recover his unpaid stock subscription.

We do not see that this case materially aids us in determining what are to be deemed " credits " under our constitution and tax laws.

But it is said that, as the makers of these notes are not permitted, by express provision of the statute, to deduct them as debts from their credits, it would be double taxation to tax them in the hands and as the property of the corporation. We do not see how there can be any double taxation. Where one deducts his debts from his credits, only the excess, not all of his credits, are taxed. If none of his debts are deducted, then *only all* his credits are taxed. He bears no more taxation than that if allowed to deduct no debt. But it is said that, while the note remains unpaid and taxed in the hands of the company, the maker would retain the money in his pocket, or the property in his possession, to pay it, and be taxed on that. This does not follow. Persons may subscribe for stock, pay one-fifth, and give their secured notes to the company for the residue, and not have in their pockets any money, or any property in their possession to pay; that they may expect to realize before being called upon for payment.

But it is further urged that this class of debtors will not be permitted to deduct this class of debts from their credits, while all other classes are permitted to deduct all other classes of debts from their credits, and that thus the rule would not be " *uniform*," as required by the constitution. Were this so, it is an objection that can only be made by some person claiming such right of deduction, for whom this corporation can not volunteer. We are not, therefore, called upon to decide the question. It may, however, be proper to state, that the auditor of state instructs the

county auditor that such notes are to be deducted by the makers from their credits when listing the latter for taxation. He argues that such notes are mere unpaid subscriptions for stock—a question not necessary for us to decide. It is noteworthy, in this connection, to observe, however, that in the case of the *Exchange Bank of Columbus* v. *Hines,* 3 Ohio St. 1, and in *Latimer* v. *Morgan,* 6 Ohio St. 279, our Supreme Court have decided that a tax law allowing any deduction of debts from credits is unconstitutional. But such section of the statute was held not to invalidate the residue of the act in which it was contained, and these decisions have never been reversed. Section 2 of the tax law of 1859, allowing such deductions, is clearly within the prohibition settled by these decisions; but it is a matter of history that after the enactment of that law, the then auditor of state followed it, and it has ever since been acted upon in this State, no tax-payers seeming to desire to apply to the courts to compel the tax officers to lay upon them heavier burdens than they already bear. Besides, there is a general conviction derived from the constitutional debates, that our constitution does not properly express what its framers intended on the subject of deducting debts from credits. But we express no opinion upon the constitutionality of the second section of the tax law of 1859. We merely refer to the decisions of the Supreme Court, subsequent legislation, and the practice of the State to illustrate this case. It is also said that mere obligations to pay are not property—they are nothing; that when made there is no more property in existence than before. Debt is a mere anticipation of the resources of the future by somebody, but when the future, out of its net products, can pay, and be compelled to pay it, it has a present worth and value.

At all events, the money value of credits is fully recognized in our constitution, and in the case cited from 3 Ohio St. 1, pp. 19, 20.

The injunction will be dissolved and the action dismissed, unless the plaintiff shall claim, by amending its petition,

that it desires to wind up its business, and in pursuance thereof, does not intend to, and will not, enforce the collection of these notes.